**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| BEKER RENGIFO DEL CASTILLO, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL HINGISS, in his individual and official capacity, BRIDGER KELCH, in his individual and official capacity, and CITY OF WHITEFISH, <br><br> Defendants. | CV 25-127-M-WWM <br><br><br> ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

Plaintiff Beker Rengifo Del Castillo ("Mr. Castillo") brought suit against Whitefish Police Officer Michael Hingiss ("Officer Hingiss"), Whitefish Chief of Police Bridger Kelch ("Chief Kelch"), and the City of Whitefish ("the City"), alleging four counts of constitutional violations under 42 U.S.C. § 1983, one violation of the Montana Constitution against the City for unconstitutional seizure, and two counts against the City for negligence and false arrest. (Doc. 3). Before this Court is the City's Motion for Partial Summary Judgment Re: State Law Claims (Doc. 17). The City asks this Court to dismiss Mr. Castillo's claims due to his failure to exhaust state law remedies, noting that the request for partial summary judgment applies only to Mr. Castillo's state law claims and not to his federal claims. (Doc. 18 at 6, n.1). For the reasons stated herein, the City's motion shall be granted.

## I.    Background

Mr. Castillo filed his Complaint on August 11, 2025, and amended it the same day.  (Docs. 1 and 3).  In the Amended Complaint, Mr. Castillo describes the dispute as one arising from a traffic stop during which he was unlawfully detained. (Doc. 1).  Mr. Castillo claims to have lawfully entered the United States and obtained a Social Security number and a Real ID compliant driver's license in 2024.  *Id.* at ¶¶ 16-17.  On April 24, 2025, after leaving work, Mr. Castillo was stopped by Officer Hingiss due to "a non-functioning passenger side break lamp." *Id.* at ¶ 25.  According to Mr. Castillo, he was able to provide valid registration, proof of insurance, and his driver's license to the officer.  *Id.* at ¶ 27.  He asserts that after this point, Officer Hingiss contacted Customs and Border Patrol ("CBP") and purportedly asked if CBP wanted to "check" Mr. Castillo.  *Id.* at ¶ 29.

According to Mr. Castillo, the stop lasted ten minutes before a CBP agent arrived, and that Officer Hingiss gave Mr. Castillo's driver's license to the CBP agent.  *Id.* at ¶¶ 41-46.  Even though the traffic stop caused the City to issue nothing more than "a warning for a broken taillight", Mr. Castillo was unable to leave because Officer Hingiss had given his driver's license to the CBP agent.  *Id.* at ¶ 47.  Mr. Castillo remained with the CBP agent and was subsequently detained and transferred to the Immigration and Customs Enforcement ("ICE") center in Tacoma, Washington, where he stayed until April 30, 2025.  *Id.* at ¶¶ 48-53.

2

Mr. Castillo alleges that Officer Hingiss did not contact a supervisor or commanding officer to determine if arrest was appropriate, and that the City has a policy requiring police officers to notify a supervisor when they detain an individual for an immigration violation and to seek approval before arresting someone for an immigration offense and before transferring an individual to federal immigration authorities, which Officer Hingiss did not follow. *Id.* at ¶¶ 49, 62-63. Mr. Castillo further alleges that the City did not train Officer Hingiss on how to handle suspected immigration violations according to policy. *Id.* at ¶¶ 66-67. To Castillo, Defendants' myriad violations of federal and state law amount to "racial profiling" because Officer Hingiss, despite having proof of Mr. Castillo's lawful presence in the United States, prolonged the traffic stop and contacted CBP based merely on the facts that Mr. Castillo is "not white" and "only speaks Spanish." *Id.* at ¶¶ 1, 2, 28, and 34.

The City and Chief Kelch answered on October 14th. (Doc. 7). Among their affirmative defenses, the City and Chief Kelch assert that Mr. Castillo's claims might be "barred, in whole or in part, based on his failure to exhaust an applicable administrative remedy." *Id.* at ¶ 20. Officer Hingiss answered separately on October 27, 2025. (Doc. 8). The City filed the instant motion on January 15th. (Doc. 17).

3

The Court set a preliminary pretrial conference for January 30th. (Doc. 15). In their preliminary pretrial statements, both Mr. Castillo and the City disclosed a pending matter filed with the Montana Human Rights Bureau ("HRB") by Mr. Castillo. (Doc. 23 at 15 and Doc. 24 at 18). Indeed, he filed a Complaint with the HRB on September 3rd, approximately one month after filing his Complaint in this Court.[1] The HRB Complaint alleges:

> When [Officer] Hingiss unlawfully detained [Mr. Castillo] to conduct an immigration investigation without any objective evidence that [Mr. Castillo] was in the United States unlawfully—and despite affirmative evidence of his lawful presence—[Officer] Hingiss violated [Mr. Castillo's] constitutional rights, violated anti-discrimination law, and breached public trust in law enforcement.

(Doc. 19-1).

The facts set forth in the HRB Complaint are nearly identical to those included in his federal Complaint to support five counts of violations of state law: (1) failure to provide governmental services without discrimination "based upon race, color, religion, creed, political ideas, sex, age, marital status, physical or mental disability, or national origin" (Mont. Code Ann. § 49-2-205(1)); (2) effecting an agreement or plan that sanctions discriminatory practices (Mont. Code Ann. § 49-3-205(2)); (3) failure "to perform policing services and other

---

[1] Above the signature line of Mr. Castillo's HRB Complaint, the document says: "Respectfully submitted this 3rd day of August, 2025." (Doc. 19-1 at 18). However, the first page of the document contains a stamp marking it as "RECEIVED SEP 03 2025" by the HRB. *Id.* at 1.

4

interactions with the public in a non-discriminatory manner" (Mont. Code Ann. § 49-2-308(1)(a)); (4) subjecting Mr. Castillo to seizure "based solely on race or ethnicity" (Mont. Code Ann. § 44-2-117(2) and Montana Constitution Article II, Section 11); and (5) failure to collect sufficient data to analyze whether Whitefish police officers "routinely stop members of minority groups for violations of vehicle laws as a pretext for investigating other violations of law, or immigration status" (Mont. Code Ann. § 49-3-205(3)).

Mr. Castillo assured the Court that the HRB would issue its Final Investigative Report no later than March 2, 2026. (Doc. 23 at 15). At the preliminary pretrial conference, the parties requested a bifurcated deadline of March 2, 2026 for amending pleadings and joining parties for any claim not before the HRB and May 29, 2026 for all claims currently pending before the HRB, which this Court included in the Scheduling Order. (Doc. 28). None of the parties have amended their pleadings or joined additional parties.

In its motion for partial summary judgment, the City contends: "the same acts forming the basis of [Mr. Castillo's] state law claims in this lawsuit . . . also form the basis of the alleged statutory violations found in his HRB complaint. Accordingly, [Mr. Castillo's] state law claims may only be pursued in accordance with the procedures outlined in the [Montana Human Rights Act]." (Doc. 18 at 5). Mr. Castillo, in response, claims that the Montana Human Rights Act ("MHRA")

5

does not require him "to exhaust state law claims that do not sound in discrimination, even if those claims share some common facts with potential discrimination claims." (Doc. 26 at 2). The City argues that all of Mr. Castillo's claims "stem from the allegation that he was unlawfully detained" and that Mr. Castillo cannot identify any conduct in support of his state law claims before this Court that arise independently of conduct prohibited by the MHRA. (*See* Doc. 29).

## II.    Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted). A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by evidence. *Harris v. Cnty. of Orange*, 17 F.4th 849, 856 (9th Cir. 2021) (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)). "The district court must not only properly consider the record on summary judgment, but must consider that record in light of the 'governing law.'" *Zetwick*

*v. Cnty. of Yolo*, 850 F.2d 436, 441 (9th Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 989 (9th Cir. 2016)).

## III.    Applicable Law

The MHRA establishes the *"exclusive remedy* for acts constituting an alleged violation" of the MHRA.  Mont. Code Ann. § 49-2-512(1) (emphasis added).  Thus, a claim for relief "may not be entertained by a district court other than by the procedures specified" in the MHRA.  *Id.*; *Borges v. Missoula C'nty Sheriff's Office*, 415 P.3d 976, 981 (Mont. 2018).  These procedures, outlined in Mont. Code Ann. §§ 49-2-501 through -505, state that "a complaint under this chapter must be filed with the department within 180 days after the alleged unlawful discriminatory practice occurred or was discovered."  Mont. Code Ann. § 49-2-501(4)(a).  The department (or HRB) must conduct an informal investigation and, if it finds reasonable cause to believe discrimination occurred, shall certify the complaint for hearing.  Mont. Code Ann. § 49-2-504(7)(a), (c).  "If the case is not settled, fully decided on order or motion, or otherwise resolved, after a hearing, [a] hearings' officer shall issue a decision."  Mont. Code Ann. § 49-2-505(3)(c).  Any party to the MHRA complaint may then appeal the hearing officer's decision to the Human Rights Commission.  Mont. Code Ann. § 49-2-505(4).  The Human Rights Commission hears all appeals within 120 days and renders a "final agency decision

7

within 90 days." Mont. Code Ann. § 49-2-505(5). Only then are final agency decisions appealable to a district court. Mont. Code Ann. § 49-2-505(3)(c).

The Montana Supreme Court has stated: "[a] party claiming discrimination may not file a claim in district court without first obtaining an adjudication of that claim by the HRB." *Borges*, 415 P.3d at 167 (*citing Griffith v. Butte Sch. Dist. No. 1*, 244 P.3d 321, 330 (Mont. 2010)); *see also Jones v. Mont. Univ. Sys.*, 155 P.3d 1247, 1256 (Mont. 2007) ("failure to exhaust available administrative remedies" under the MHRA precluded petitioners "from brining a viable claim in district court" and *Shields v. Helena Sch. Dist. No. 1*, 943 P.2d 999, 1005 (Mont. 1997) ("[n]o action may be filed in district court until the procedures of the Montana Human Rights Commission have been exhausted")).

"To determine whether a claim that is not directly couched under the MHRA is nonetheless governed by the MHRA, this Court looks to the 'gravamen of the' complaint." *Lechowski-Mercado v. Seeley Swan High Sch.*, CV 21-10-M-DLC, 2022 U.S. Dist. LEXIS 146367, at *6 (D. Mont. 2022) (quoting *Lay v. State Dept. of Military Affairs, Disaster and Emergency Servs. Div.*, 351 P.3d 672, 675 (Mont. 2015)).[2] The gravamen is the "substantial point or essence of a claim, grievance,

---

[2] In *Lay*, the Montana Supreme Court stated: "This Court is no stranger to attempts to characterize a claim in such a way so as to avoid the exclusive procedures set forth in the MHRA. . . . In determining whether the MHRA is applicable, we look to the gravamen of the party's complaint, as opposed to the party's characterization of [its] claims. We have recognized that litigants can frequently employ tort terminology to improperly re-characterize what is at the heart of their complaint, and that permitting a party to bypass the MHRA's procedures in so

8

or complaint." *Gravamen*, BLACK'S LAW DICT. (12th ed. 2024). The analysis, therefore, focuses on the "nature of the alleged conduct," not how the claim is characterized. *Lay*, 351 P.3d at 675 (quoting *Saucier v. McDonald's Rests. of Mont., Inc.*, 179 P.3d 481, 494-95 (Mont. 2008)).

## IV.    Analysis

Mr. Castillo's HRB Complaint centers around one substantial point: that he was discriminated against based on his "race, ethnicity, national origin or language" during the traffic stop because he is "not white" and "speaks Spanish." (Doc. 19-1 at ¶¶ 25, 69, 70, 74, and 82); *see also* (Doc. 19-1 at 1 ("**Complaint Type: Race, national origin, ethnicity discrimination.**") (emphasis in original)). The essence of Mr. Castillo's state law claims in federal court, which arise from the same set of facts, is virtually identical:  Mr. Castillo was discriminated against based on his race, ethnicity, national origin or language when Officer Hingiss, acting within the scope of his employment by the City, prolonged a traffic stop to conduct an immigration investigation due to Mr. Castillo being "not white" and speaking "only Spanish." (Doc. 3 at ¶ 93 ("Hingiss, acting in the course and scope of employment, unlawfully extended [Mr. Castillo's] stop to conduct an immigration investigation without particularized suspicion . . . that [Mr. Castillo]

---

doing would be to eviscerate the mandate of the MHRA, requiring that it provide the exclusive remedy for acts constituting violations thereof." *Lay*, 351 P.3d at 675 (internal citations and quotations omitted).

9

had committed any immigration violations, civil or criminal"); *see also* (Doc. 3 at ¶¶ 28, 34, 95-96, 102-105, 109-111)). Mr. Castillo cannot escape this analysis by couching these claims as either constitutional violations or statutory violations, as discussed in more depth, below.

A.    *Mr. Castillo's Claim of Unconstitutional Seizure is not Exhausted.*

Article II, Section 11 of the Montana Constitution provides: "people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant . . . shall issue . . . without probable cause. . . ." Mr. Castillo argues that because a claim under Article II, Section 11 creates a self-executing cause of action, it is not subject to MHRA exclusivity. (Doc. 26 at 13). The Court disagrees because the MHRA requires exhaustion of administrative remedies for all alleged violations of the MHRA, including discrimination from any state or local government agency "based upon race, color, religion, creed, political ideas, sex, age, marital status, physical or mental disability, or national origin." Mont. Code Ann. §§ 49-2-512(1) and 49-3-205(1). Thus, "even if a litigant premises what is really an MHRA claim under other legal theories such as the Montana Constitution," the MHRA's procedures control the claim until final resolution by the HRB commission. *Lechowski-Mercado*, at *6.

Mr. Castillo cites *Jarussi v. Board of Trustees*, 664 P.2d 316 (Mont. 1983) to support the idea that the MHRA's exhaustion doctrine "does not apply to

10

constitutional issues." (Doc. 26 at 14). For the reasons outlined in the City's reply (Doc. 29 at 12-13), *Jarussi* is distinguishable insofar as the holding applies "only when the matter at issue involves a pure question of *constitutional law, not accompanied by* an issue regarding a fact-based determination within the pertinent jurisdiction of the agency to decide." *See City of Great Falls v. Int'l Ass'n of Fire Fighters*, 560 P.3d 621, 633 (Mont. 2024) (emphasis in original) (citing *Shoemaker v. Denkei*, 84 P.3d 4, 8 (Mont. 2004)). Mr. Castillo's state constitutional claim is certainly accompanied by, if not wholly dependent upon, the fact-intensive inquiry of whether the prolonged stop was motivated by discriminatory practices. This inquiry is within the province of the HRB.

B.    *Mr. Castillo's Negligence Claim is not Exhausted.*

"Negligence-based claims or claims for negligent and intentional infliction of emotional distress" are barred from being heard by the district court before the HRB "'where those claims arise' from conduct prohibited by the MHRA" are to be heard initially. *Lechowski-Mercado*, at *7 (quoting *Arthur v. Pierre Ltd.*, 100 P.3d 987, 992 (Mont. 2004)). The discriminatory practices that Mr. Castillo alleges are directly banned by the MHRA, but Mr. Castillo overlooks this principle in relying on a case pertaining to *res judicata*. (Doc. 26 at 11-12) (citing *Stricker v. Blaine Cnty.*, 538 P.3d 394 (Mont. 2023)).

The doctrine of *res judicata*, or collateral estoppel, applies in instances where "'*prior adjudication* is identical to the issue raised in the present case.'" *Stricker*, 538 P.3d at 399 (quoting *McDaniel v. State*, 208 P.3d 817, 826 (Mont. 2009) (emphasis added)). In *Stricker*, which was the third in a trilogy of fact-intensive cases, the Estate argued that estoppel did not preclude its claims after a hearing examiner had issued a final decision on the Estate's negligence claim. *Id.* at 396. The HRB hearing examiner found no evidence of discrimination leading to the decedent's death. *Id.* at 397. The Court recognized that, although the HRB "has no authority to determine a common-law negligence claim," the HRB does have "the authority to 'sit in independent judgment of complaints of alleged discrimination in Montana'" and that an aggrieved party "must bring such claims" before the HRB before pursuing them in court. *Id.* at 400. Therefore, where a common-law negligence claim sounds in discrimination or arises from conduct prohibited by the MHRA, the proper forum for its adjudication is in front of the HRB, and the MHRA must be exhausted. *See Lechowski-Mercado*, *7.

As the City points out, Mr. Castillo "does not identify any factual allegations supporting his negligence claim that are even arguably independent of the alleged discrimination." (Doc. 29 at 9). Instead, Mr. Castillo's pleadings establish that, but for the alleged "racial profiling" encouraged by the City's negligence, he may not have been stopped at all. This theory of the case clearly sounds in

12

discrimination, and Mr. Castillo's negligence claim flows from this theory, not independently.

C.    *Mr. Castillo's False Arrest Claim is not Exhausted.*

Mr. Castillo asserts that his final state law claim against the City, false arrest, "does not turn on discrimination." Mr. Castillo believes that he need only "establish that the City arrested, or caused [him] to be arrested, without probable cause." Mr. Castillo correctly states the elements of false arrest, *see* Doc. 26 at 16 (citing *Kichnet v. Butte-Silver Bow C'nty.*, 274 P.3d 740, 745 (Mont. 2012) and *Harrer v. Montgomery Ward & Co.*, 221 P.2d 428, 433 (Mont. 1950)), but the basis of his claims arise from the alleged discriminatory actions of Officer Hingiss and, by proxy, the City.

To prove the first element of false arrest, Mr. Castillo may claim that Officer Hingiss caused him to be detained when he did not give his driver's license back and provided it instead to the CBP agent. (Doc. 3, at ¶ 37). As for the "without probable cause" element, Mr. Castillo does not allege facts supporting any other grounds for detention beyond the alleged discrimination. Mr. Castillo claims "Hingiss had no objective facts or information indicating [he] had committed a criminal act that subjected him to custodial arrest under Montana or federal law." (Doc. 3 at ¶ 30). What, then, was the reason for Mr. Castillo's detention? The Court concludes that Mr. Castillo is limited to his chief theory: that he was

discriminated against and detained unlawfully due to the fact he is "not white" and "speaks Spanish." *Id.* at ¶ 28. This complaint must be exhausted under the MHRA.

## V.    Conclusion

The nature of each state law claim pled by Mr. Castillo is a determination within "the province of the court." *Saucier*, 179 P.3d at 494. Despite Mr. Castillo's attempts to focus on the elements of each alleged violation (*see* Doc. 26 at 6 ("[c]laims that do not require discrimination as an element of proof are not subject to the MHRA")), the essence of Mr. Castillo's claims against the City sound in discrimination. Taken as true, his allegations suggest that the City's training, policies, and employees perpetuated an environment of racial profiling that ultimately led to Mr. Castillo's stop, detention, and transport to an ICE facility in Washington. Without the allegation or even insinuation of discriminatory conduct strictly prohibited by the MHRA, Mr. Castillo would be unable to support his claims. These claims were not filed with the HRB until September 3, 2025, and, as far as this Court is aware, are the subject of ongoing proceedings. Accordingly, Mr. Castillo must exhaust any and all available remedies under the MHRA before seeking the Court's review.

Therefore, based upon the analysis discussed herein,

**IT IS HEREBY ORDERED** that the City's Motion for Partial Summary Judgment Re: State Law Claims (Doc. 17) is GRANTED.

**IT IS FURTHER ORDERED** that Mr. Castillo's state law claims against the City of Whitefish (Counts V, VI, VII, and VIII) are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 7th day of April, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE

15